DENNIS L. KENNEDY
Nev. Bar No. 1462
SARAH E. HARMON
Nev. Bar No. 8106
KELLY B. STOUT
Nev. Bar No. 12105
Bailey❖Kennedy
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148-1302
Telephone Number: (702) 562-8820
Fax Number:  (702) 562-8821
DKennedy@BaileyKennedy.com
SHarmon@BaileyKennedy.com
KStout@BaileyKennedy.com

*Attorneys for Michelle McKenna*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Michelle McKenna,<br>　　　　　　Plaintiff,<br>　　vs.<br>David Z. Chesnoff, Chtd. P.C. d/b/a Chesnoff & Schonfeld; David Z. Chesnoff, and Richard A. Schonfeld,<br>　　　　　　Defendant. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I.   JURISDICTION & VENUE.

1.　　This Court has jurisdiction over this action because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and the action is between citizens of different states.  28 U.S.C. § 1332(a)(1).

2.　　Venue is proper in the United States District Court for the District of Nevada because the Defendants are all subject to personal jurisdiction in, and are residents of, Nevada. 28 U.S.C. § 1391(b)-(c).

/ / /

/ / /

**II. Case Summary.**

3. Plaintiff Michelle McKenna ("Michelle"), was a cocktail waitress at PURE Nightclub ("Pure") in Caesars Palace. On January 3, 2009, Michelle was brutally attacked by Patrick Jones ("Jones"), who is the son of Caesars Vice President, Jan Jones Blackhurst. During the attack, Michelle suffered a traumatic brain injury and other physical harm, which have resulted in permanent physical and cognitive disabilities. Michelle retained David Z. Chesnoff ("Chesnoff") and Richard A. Schonfeld ("Schonfeld") of the law firm Chesnoff & Schonfeld to represent her in a personal injury lawsuit against Jones, Pure, and Caesars. However, Chesnoff, who is believed to have an undisclosed financial interest in Pure, and was also representing Pure executive, Steve Davidovici, in a tax evasion case during the pendency of the personal injury action. In order to protect Chesnoff's conflicting interests, Chesnoff & Schonfeld failed to name Pure or Caesars as defendants in the action prior to the expiration of the statute of limitations and did not adequately investigate or prosecute Michelle's case. Consequently, Michelle recovered only a fraction of her damages, and now brings claims against Chesnoff & Schonfeld for legal malpractice, breach of fiduciary duty, and deceptive trade practices.

**III. THE PARTIES.**

4. Defendant, Chesnoff & Schonfeld, is a domestic professional corporation, formed and existing under the laws of the State of Nevada with its principal place of business in Clark County, Nevada.

5. Defendant, David Z. Chesnoff, is a resident of Nevada.

6. Defendant, Richard A. Schonfeld, is a resident of Nevada.

7. Plaintiff, Michelle, is a United States resident, and a resident of a state other than Nevada.

**IV. THE UNDERLYING LITIGATION.**

8. In the early morning hours of January 4, 2009, Michelle was violently attacked by Patrick Jones, a guest at Pure, a Las Vegas nightclub where Michelle was a cocktail server.

///

9. Michelle thereafter retained the law firm Chesnoff & Schonfeld to represent her in a personal injury action against Jones, Pure, and Caesars.

10. Defendants filed a Complaint in Nevada's Eighth Judicial District Court on November 28, 2010, styled *Michelle McKenna v. Patrick Jones*, Case No. A-10-630290-C (the "Underlying Case").

11. Defendants failed to adequately investigate and prosecute the underlying case, including, but not limited to, the following acts and omissions:

    a. Defendants did not bring any claims against Pure or Caesars within the applicable statute of limitations;

    b. Defendants did not conduct an adequate investigation; they failed to request key documents from the defendant and third-parties; and they did not interview and/or depose material witnesses;

    c. Defendants did not seek damages for lost wages and future care totaling millions of dollars;

    d. Defendants did not retain an economic expert to quantify Michelle's damages;

    e. Defendants did not provide evidence or produce documents that were necessary to prove the amount of Michelle's damages.

12. After four and a half years of unexplained delays, virtually no communication from the Defendants regarding the case, and effectively no progress, Michelle was worried about her case and sought new counsel.

13. Ultimately, Michelle was able to retain the law firm of Cohen & Padda, who resolved the case for her.

14. Even after Cohen and Padda had filed a substitution of counsel, Defendants took more than a month to transfer Michelle's file to her new counsel, which further prejudiced her case.

15. While Cohen & Padda sought to remedy and mitigate the effects of Defendants' inadequate representation, it was too late to cure many of Defendants' failures:

      a. All claims against Pure and Caesars were already barred by the statute of limitations;

      b. Cohen & Padda did not have adequate time to secure the additional evidence necessary to prove her claims; and

      c. Cohen & Padda were barred from producing additional documents necessary to prove Michelle's claims because of Defendants' delays.

16. Although Michelle's expert (retained by Cohen & Padda) valued her damages as more than $10,000,000.00, Defendants' errors forced Michelle to settle for $225,000.00 from Blackhurst's homeowners' insurance – less than 5% of her actual damages.

### A. KEY PLAYERS IN THE UNDERLYING CASE.

#### *i. Caesars Palace*

17. Caesars Palace is a hotel-casino resort located in Las Vegas, Nevada.

18. Upon information and belief, Caesars Palace is owned and operated by Caesars Entertainment Corporation ("Caesars Entertainment") (jointly "Caesars").

19. Before November 2010, Caesars Entertainment was known as Harrah's Entertainment, Inc.

#### *ii. Jan Jones Blackhurst*

20. Jan Jones Blackhurst ("Blackhurst") has been an employee of Caesars Entertainment Corporation (formerly Harrah's Entertainment) since 1999.

21. For the eight years before joining Caesars, Blackhurst served as Mayor of Las Vegas.

22. In 2009, Blackhurst was Senior Vice President of Communications and Government Relations for Harrah's Entertainment, Inc.

#### *iii. Pure Nightclub*

23. Pure is a nightclub that is located within Caesars Palace.

24. Upon information and belief, Pure was operated by Touch, LLC ("Touch") at all times relevant to this case.

25. Upon information and belief, Pure was managed by Pure Management Group ("PMG") at all times relevant to this case.

26. Upon information and belief, Steve Davidovici and Robert Frey were part owners and co-managers of various business entities that controlled and operated Pure at all times relevant to this case.

### *iv. Plaintiff, Michelle McKenna*

27. Michelle began working for PMG in approximately 2002 as a cocktail server at one of its other properties.

28. When Pure opened, Michelle transferred to open the new club.

29. While at Pure, Michelle worked as a cocktail server and trainer.

30. Michelle continued working at Pure until November 26, 2012, when PMG fired her due to physical and cognitive disabilities resulting from Jones' attack.[1]

### *v. Patrick Jones*

31. Jones is the son of Blackhurst and Fletcher "Ted" Jones, Jr.

32. Jones had a history of abusing alcohol and illegal drugs.

33. Upon information and belief, Jones had a history of violent and/or aggressive behavior as a teen and young adult.

34. In 2009, Jones was a student at the University of Arizona.

35. During the pendency of the personal injury action, Jones participated in the General Manager training program of his father's automotive empire, Fletcher Jones Motor Cars, Inc., and then took a sales position at a California Toyota dealership.

///

///

---

[1] Michelle has filed suit against the subsequent owners of Pure, Hakkasan Ltd, and AMG related to her firing. She has asserted claims for employment discrimination, retaliation, violation of the Americans with Disabilities Act, intentional infliction of emotional distress, negligent hiring, negligent retention, and negligent supervision. Compl., *McKenna v. Hakkasan Ltd.*, No. 2:14-cv-01222-GMN-GWF, July 25, 2014, ECF No. 16.

### B. JONES ATTACKS MICHELLE AT PURE.

36. On January 3, 2009, Michelle was working as a cocktail waitress at Pure and assigned to tables in the raised, bottle service area.

37. Blackhurst had arranged reservations for her son and several friends at Pure, and authorized his bill to be "comped" (i.e., charged to Caesars).

38. Due to his mother's position with Caesars Entertainment, Caesars and Pure both considered Jones to be a VIP.

39. Jones and his friends arrived at Pure at approximately 11:00 p.m., on January 3, 2009.

40. Jones' friends included Jon Curran, Zachary Goldberg, Michelle Issacs, and Paul ("P.C.") Youngblood, among others.

41. Before arriving at Pure, Jones had consumed several alcoholic beverages at his home and in the limousine on the way to Pure.

42. Keith Leavitt ("Leavitt"), Pure's Director of Customer Development, was assigned to host Jones and his friends.

43. Leavitt met Jones and his friends at the door, and he sat the group at a table located in Michelle's section.

44. Leavitt explained to Michelle that Jones' mother worked for Harrah's and that the table's bill should be charged to Blackhurst's comp number.

45. While at Pure, Jones and his friends were served $3,446.02 worth of beverages, which included five bottles of liquor.

46. At approximately 1:00 a.m. on the morning of January 4, 2009, Jones asked Michelle to sit on his lap.

47. When Michelle refused his advances and turned to leave, Jones pulled her into his lap.

48. Michelle threw his hands off of her, jumped up, turned around to face him, and began to explain that his conduct was inappropriate.

49. Jones responded by calling her a "f***ing bitch" and making inappropriate gestures.

50. Michelle looked for help, but did not see a single security guard.

51. Upon information and belief, Pure had fired approximately thirty (30) security guards in December 2008, and the club was not adequately staffed by security.

52. Upon information and belief, Caesars security oversaw Pure and was often present in the club to ensure the safety and security of Pure's employees and guests.

53. Upon information and belief, Caesars had knowledge that Pure did not have adequate security staff on duty.

54. Upon information and belief, Caesars had knowledge that Pure did not conduct adequate surveillance of the premises.

55. Seeing Assistant General Manager, Dan Bondy, across the room, Michelle waved for him to come over.

56. However, before Bondy was able to make his way over to Michelle, Jones lunged at her, placed his hands around her throat, and began choking and shaking her.

57. Struggling against Jones and unable to breathe, Michelle blacked out and fell.

58. When Bondy arrived, he wrestled Jones, who was 6' 1" tall and weighed 220 pounds, off of Michelle and began walking him away from Michelle.

59. Jones remained very aggressive – struggling to break free of Bondy's grasp, using profanity, and threatening to use his parents' influence to have Bondy fired.

60. Still gasping for air, Michelle made her way off the main floor while Bondy and a security guard, Alex Walker, escorted Jones safely out of the club through the back door.

### C. **THE COVER-UP.**

61. Upon information and belief, Pure and Caesars sought to help Jones escape civil and criminal liability for his actions.

///

///

62. In violation of its own procedures, Pure's security staff did not detain Jones, contact the police, conduct any investigation, preserve any evidence, or properly document the attack.

63. Pure also attempted to keep Michelle from filing a police report and obtaining any medical treatment.

### i. *Michelle Received No Assistance from Pure.*

64. Following the attack, Michelle informed Pure's staff that she wanted to file a police report and that she had sustained serious injuries.

65. Although Bondy told Michelle that he was calling the police, neither he nor anyone else notified the police or Caesars' security staff.

66. Upon information and belief, Las Vegas Metro Police Department had officers stationed inside of Caesars Palace and Pure's security staff had the ability to communicate with both Caesars' security and Metro.

67. Upon information and belief, Pure led Michelle to believe that its staff had contacted the police to prevent her from placing the call herself.

68. Thinking that Pure had called the police, Michelle lay on the stockroom floor for the remaining three hours of her shift waiting for the police to take her statement.

69. During this time, Michelle continued having difficulty breathing, lost consciousness for several short periods, and experienced severe pain in her chest, neck, and head.

70. Although Michelle explained to security guard Walker that Jones had choked her and she still could not breathe, Pure did not provide Michelle with any medical attention, call an ambulance, or drive her to the hospital.

71. Upon information and belief, Caesars always has paramedics on-site, but Pure failed to contact the paramedics for her.

72. Instead, Walker told Michelle that she was just experiencing an adrenalin rush and that all she needed was a good night's sleep.

/ / /

73. After the club closed at 4:00 a.m., Michelle continued to wheeze heavily and was so dizzy that she could not walk without assistance.

74. After the lights came on, Michelle found General Manager, Ian Farr, at the main bar and told him about the attack.

75. Farr stated that he was not aware of the incident, and notwithstanding her injuries, had Pure's security staff walk Michelle to her car so she could drive herself home.

76. When leaving Pure, Michelle was dizzy, disoriented, and confused.

### ii. *Pure Helps Jones Escape.*

77. If Pure's security staff had followed its usual procedures, they would have called the police and detained Jones until officers arrived, investigated, and documented the incident.

78. Moreover, even when a guest is not held for the police, Pure's policy is that the offending guest is escorted out of the nightclub and handed off to Caesars' security.

79. Instead, Pure's staff hustled Jones out of the club and off of Caesars' property.

80. After escorting Jones out of the club, Walker called his supervisor, Jeff Wolff, on the radio.

81. Wolff arrived on the scene and instructed Walker to go back inside.

82. Moments later, Leavitt showed up with some of Jones' friends.

83. Leavitt was very concerned about the situation, and repeatedly reminded the other staff that Jones' mother was a Caesars executive and that Jones was an important person.

84. When Bondy returned to the club, Leavitt and Wolff were the only staff that remained with Jones.

85. Later, Jones' friends returned to their table without Jones and reported that Jones went home in a cab.

86. In addition to failing to contact Caesars' security and detaining Jones until security or the police arrived, Pure's security staff further violated its own procedures by failing to adequately investigate or document the attack, which includes the following omissions:

    a. Failing to identify potential witnesses;

      b. Failing to take any statements from Michelle or any employees who observed or participated in the incident, like Dan Bondy, Alex Walker, or the DJ who witnessed most of the attack;

      c. Failing to log the incident or create an incident report until January 8, 2014 – five days after the attack, when Pure's security policies require the report to be completed the same night as the incident; and

      d. Failing to record Jones' attack (despite over 30 security cameras located around the nightclub) and/or failing to preserve any footage of the assault;

87. Upon information and belief, Caesars became aware of Jones' conduct no later than the morning of January 4, 2009.

88. Caesars took no steps to notify the police or otherwise investigate the attack.

### D. **JONES REMAINS WELCOME AT PURE.**

89. Pure's policies dictate that a guest who physically assaults an employee or another guest is "trespassed" from Pure – informed that he is not welcome on the property and that returning would be in violation of the law.

90. Depending upon the severity of the assault, a guest can be "trespassed" for an evening, a set period of time, or permanently.

91. Notwithstanding Jones' conduct, Pure and Caesars permitted him to return to Pure only months after his attack on Michelle.

92. On or about April 18, 2009, Jones was again admitted to Pure as a VIP guest.

93. As before, Blackhurst authorized a "comp" for Jones and several friends and Leavitt made the reservations.

94. When Jones and his friends arrived, the host seated the party near Michelle's section.

95. Shocked, Michelle ran downstairs into the employee locker room crying and very upset.

/ / /

96. After regaining some of her composure, Michelle informed a manager that Jones should not be allowed into Pure.

97. Michelle was informed that Jones would be permitted to remain in the club, and she was instructed to stay away from him.

98. Next, Michelle raised her concerns to General Manager, Ian Farr, who said that Robert Frey had personally authorized Jones' visit.

99. For the remainder of the evening, Michelle was forced to work with Jones sitting in the next section.

100. Michelle was so upset that she was unable to come into work the following night.

### V.    **MICHELLE'S INJURIES.**

101. On the morning of January 5, 2009, Michelle was still experiencing severe pain and made an appointment to see her regular physician.

102. However, Michelle's doctor was not willing to treat her because Pure had not provided her with the appropriate medical form.

103. Michelle immediately contacted Pure's Human Resources Department, but no one returned Michelle's call until the next afternoon.

104. At her appointment, Pure's Director of Human Resources tried to dissuade Michelle from seeking medical treatment.

105. Despite the fact that Michelle had never tested positive for drugs at any time during her employment with PMG and there were no allegations that Michelle had been using drugs, the Director of Human Resources further delayed Michelle's access to treatment by requiring that Michelle take a drug test before she would authorize any medical treatment.

106. As a result, Michelle did not obtain the proper documentation until approximately 7:00 p.m. on January 6, 2009 – more than 48 hours after being attacked.

107. Pure further hindered Michelle's access to medical treatment by requiring that she visit a specific clinic that was open only until 7:30 p.m.

///

108. After less than a week, Michelle received an angry call from one of Pure's managers demanding that she return to work if she wanted to continue working at Pure.

109. Fearing for her job, Michelle returned to work.

110. At that time, Michelle was still showing physical signs of the attack – she had bruising around her neck and it was evident from her gait that she was still in pain.

111. Since the date of the attack, Michelle has seen more than 14 medical providers – many of them specialists – but continues to suffer from the debilitating effects of the attack.

112. In the years since the attack, Michelle has suffered severe headaches, vertigo and dizziness, blackout/fainting spells, balance and coordination problems, blurred vision, nausea, and severe cognitive impairments.

113. Diagnostic tests later revealed that Michelle's injuries included a crushed larynx, damaged jugular veins, and a traumatic brain injury.

114. Based on her injuries and need for future care, Michelle's expert estimated her damages in excess of $10 million.

### VI. MICHELLE RETAINS CHESNOFF & SCHONFELD.

115. Although Michelle was acquainted with Bruce Becker, owner of Becker Gaming, the two had not spoken for some time.

116. On January 6, 2009, Becker called Michelle and urged her to retain Defendants Chesnoff and Schonfeld to represent her in a personal injury action.

117. Upon information and belief, Bruce Becker and the Becker family were close, long-term friends of Blackhurst, and both Blackhurst and Becker were friends of Chesnoff.

118. Unaware of Chesnoff and Becker's connection to the Jones family, Michelle took Becker's advice and retained Chesnoff & Schonfeld.

### VII. CHESNOFF & SCHONFELD'S CONFLICT OF INTEREST.

119. At the time that Michelle retained Chesnoff & Schonfeld, Chesnoff had at least two conflicts of interest.

///

120. Upon information and belief, Chesnoff was an investor in Pure, and had a current financial interest in its success.

121. Steve Davidovici ("Davidovici") is a former executive of Pure, who was the subject of an IRS investigation into unreported "tip pool" funds that began in 2008 and was ultimately convicted of criminal charges.

122. Upon information and belief, Chesnoff's representation of Davidovici began as early as 2008 and continued through 2012.

123. Michelle's interest in pursuing claims against Pure was directly adverse to Davidovici's interest as a Pure executive.

124. There was significant risk that Chesnoff's representation of Davidovici and his own financial interest in Pure would materially limit his representation of Michelle.

125. As a partner in a law firm, Chesnoff's conflicts are imputed to all of the lawyers within the firm.

126. Defendants did not secure Michelle's written, informed, consent to the conflict.

**VIII.    CHESNOFF & SCHONFELD'S INADEQUATE REPRESENTION.**

127. Shortly after the attack, Michelle retained Chesnoff & Schonfeld to represent her in an action against Jones, Pure and Caesars.

128. During the four and a half years that Defendants represented Michelle, the case was not adequately investigated or prosecuted.

129. On November 28, 2010, Defendants filed a complaint alleging claims against Jones, and several unnamed defendants.

130. Defendants never amended the Complaint to assert claims against Pure or Caesars.

131. When Michelle asked the Defendants to specifically name Pure and Caesars, Defendants informed her that it was not necessary because they were already included – as the "Doe" and "Roe" Defendants.

/ / /

132. By the time that Michelle's subsequent counsel, Cohen & Padda, obtained leave to amend the Complaint, all claims were time-barred by the applicable statutes of limitations.

133. After waiting almost two years to file the Complaint, Defendants requested four extensions of discovery totaling almost a year and a half.

134. However, Defendants did not conduct discovery designed to discover facts that would support claims against Pure and Caesars and support the claims asserted against Jones, including, but not limited to, the following:

    a. Deposing representatives of the corporate entities that own and operate Pure and Caesars Palace;

    b. Deposing Blackhurst;

    c. Deposing Keith Leavitt;

    d. Deposing Jeff Wolff;

    e. Deposing Jones' friends who accompanied him to Pure on January 3, 2009;

    f. Obtaining documents relating to Caesars' responsibility for security within Pure;

    g. Obtaining documents relating to Caesars' and/or Pure's knowledge of Jones' history of alcohol and substance abuse, and violent tendencies; and

    h. Moving to compel compliance with subpoenas and document requests.

135. Although Michelle provided Defendants with copies of all of her records, Defendants failed to produce key documents that were essential to support elements of Michelle's claims, including, but not limited to, the following:

    a. Medical records relating to treatment obtained during 2009 and 2010;

    b. Michelle's income statements for 2008 and 2009; and

    c. Michelle's tax returns for 2008 and 2009.

136. Shortly before the case settled, the Court ordered that Michelle would be precluded from using any documents not properly disclosed during discovery, except for medical records pertaining to ongoing treatment.

137. Defendants failed to secure an expert to calculate Michelle's economic damages.

138. Defendants' calculation of damages was limited to past medical expenses in the amount of $56,129.54; unspecified damages for pain, suffering, and emotional distress; and punitive damages.

139. Upon taking over the case, Cohen & Padda retained, Stan Smith, Ph.D., to opine on the amount of Michelle's damages.

140. Mr. Smith calculated Michelle's damages as follows:
   a. $5,243,928 – Loss of wages and employee benefits;
   b. $ 649,011 – Loss of Household/Family Housekeeping and Household Management Services;
   c. $1,652,471 – Cost of Future Life Care;
   d. $3,546,376 – Reduction of Life Value

141. However, as a result of Defendants' failure to disclose Michelle's financial documents, Jones sought to strike Mr. Smith's damages opinion.

142. Jones' pending motion to strike impacted Michelle's bargaining power during settlement negotiations, and Michelle ultimately was unable to recover the vast majority of her damages.

### IX.    CLAIMS.

#### Cause of Action No. 1:    LEGAL MALPRACTICE/PROFESSIONAL NEGLIGENCE (AGAINST ALL DEFENDANTS)

143. Michelle realleges and incorporates by reference the averments contained in all previous paragraphs, inclusive, as though fully set forth herein.

144. Michelle and Defendants had an attorney-client relationship.

145. Chesnoff and Schonfeld each owed Michelle a duty to use the skill, prudence, and diligence possessed by lawyers of ordinary skill and capacity in exercising and performing tasks which they undertook on Michelle's behalf.

///

146. Chesnoff and Schonfeld each breached his respective duties to Michelle by acts and/or omissions that include, but are not limited to, the following:

    a. Failure to disclose the fact and/or extent of Defendants' conflicts of interest;

    b. Failure to assert claims against Caesars and Pure within the statutory period;

    c. Failure to identify and/or assert claims against Jones, Caesars and Pure arising out of the events at issue;

    d. Failure to adequately investigate and prosecute Michelle's case;

    e. Failure to communicate with Michelle regarding the status of her case, the means by which her objectives should be accomplished, and respond to Michelle's questions about her case.

147. Michelle suffered actual loss or damages as a result of Defendants' negligence.

148. Had Defendants timely brought claims against Pure and/or Caesars Palace, Michelle would have been able to recover far more in damages, either through judgment or settlement, than she ultimately received in settlement.

149. Had Defendants adequately investigated and prosecuted Michelle's case, she would not have been forced to settle and would have been able to obtain a judgment against Jones for far more than she received in settlement.

150. Chesnoff & Schonfeld is liable for the acts and omissions of its partners, Mr. Chesnoff and Mr. Schonfeld.

151. As a direct and proximate result of the foregoing acts, Michelle has suffered damages in excess of $75,000.00, according to proof.

**Cause of Action No. 2:   BREACH OF FIDUCIARY DUTY**
**(AGAINST ALL DEFENDANTS)**

152. Michelle realleges and incorporates by reference the averments contained in all previous paragraphs, inclusive, as though fully set forth herein.

///

///

153. Michelle and Defendants had an attorney-client relationship, which is a relationship in which the client has the right to trust and have confidence in the integrity and fidelity of another.

154. Chesnoff and Schonfeld each owed Michelle the highest duty of fidelity, loyalty, and honesty in representing her and prosecuting her case.

155. Chesnoff and Schonfeld each breached their respective duties to Michelle by failing to represent her and adequately investigate and prosecute her case.

156. Chesnoff & Schonfeld is liable for the acts and omissions of its partners, Mr. Chesnoff and Mr. Schonfeld.

157. Chesnoff & Schonfeld (and each of its partners) also separately failed to ensure that it had proper measures in place to ensure that its attorneys competently and diligently represented their clients.

158. As a direct and proximate result of the foregoing acts, Michelle has suffered damaged in excess of $75,000.00, according to proof.

**Cause of Action No. 3:   DECEPTIVE TRADE PRACTICES**
**(AGAINST ALL DEFENDANTS)**

159. Michelle realleges and incorporates by reference the averments contained in all previous paragraphs, inclusive, as though fully set forth herein.

160. Defendants, and each of them, have violated the Nevada Deceptive Trade Practices Act, NRS 598.0915(15), by knowingly making false representations by omission, including:

    a. Failing to disclose the existence of a concurrent conflict of interest and its effect on common representation;

    b. Failing to disclose their divided loyalty and compromised professional judgment in light of the conflicts of interest; and

    c. Failing to disclose their unwillingness to competently and diligently represent Michelle.

161. Defendants, and each of them, have violated the Nevada Deceptive Trade Practices Act, NRS 598.0923(2) by knowingly failing to disclose material facts related to the representation, including:

    a. The existence of a concurrent conflict of interest and its effect on common representation;

    b. Their divided loyalty and compromised professional judgment in light of the conflicts of interest; and

    c. Their unwillingness to competently and diligently represent Michelle.

162. Defendants, and each of them, have violated the Nevada Deceptive Trade Practices Act, NRS 598.0923(3) by knowingly violating myriad regulations relating to the sale of their legal services, including:

    a. Failing to competently and diligently represent Michelle in violation of Nevada Rules of Professional Conduct ("NRPC") 1.1 and 1.3;

    b. Failing to promptly inform Michelle of, and to consult with Michelle regarding, their litigation and trial strategy;

    c. Failing to exercise independent professional judgment and to provide candid advice in violation of NRPC 2.1; and

    d. Engaging in professional misconduct by violating the Nevada Rules of Professional Conduct in violation of NRPC 8.4(a).

163. Chesnoff & Schonfeld is responsible for each of the violations of NRS 598.0915(15), NRS 598.0923(2), and NRS 598.0923(3) committed by Chesnoff and/or Schonfeld.

164. Defendants each had a statutory duty to refrain from knowingly committing deceptive trade practices in the course of their businesses.

165. As a direct and proximate result of the foregoing deceptive trade practices, Michelle has suffered damages in excess of $75,000.00, according to proof.

///

166. Michelle was forced to retain the services of legal counsel to prosecute this claim, and is entitled to attorneys' fees and costs related to this action as permitted by law, including under NRS 41.600(3)(c).

**Cause of Action No. 4: DECLARATORY JUDGMENT**
**(AGAINST ALL DEFENDANTS)**

167. Michelle realleges and incorporates by reference the averments contained in all previous paragraphs, inclusive, as though fully set forth herein.

168. Defendants have asserted a lien in the amount of $62,970.37 on the settlement Michelle received in the underlying case and maintain a present right to collect.

169. Michelle disputes Defendants' entitlement to any fees due to Defendants' breach of their respective duties and obligations owed to Michelle.

170. The parties' disagreement presents an actual justiciable controversy.

171. Michelle requests a declaratory judgment regarding Defendants' right to payment for legal services and the enforceability of Defendants' lien.

## X. PRAYER FOR RELIEF.

172. Michelle requests that this Court issue the following relief against Defendants, and each of them:

    a. An award of compensatory and consequential damages in an amount in excess of $75,000.00, to be determined at trial;

    b. An award of exemplary and punitive damages, according to proof;

    c. A declaratory judgment determining Defendants' right to payment for legal services rendered in connection with the underlying matter, and the enforceability of Defendants' lien;

    d. Award of attorneys fees and costs; and

    e. Any other relief as the Court determines is just and proper.

///

## XI. **JURY TRIAL DEMANDED.**

Plaintiff demands a trial by jury on all issues so triable.

DATED this 24th day of October, 2014.

                                                              BAILEY❖KENNEDY

                                                              By: /s/Dennis L. Kennedy
                                                                   Dennis L. Kennedy
                                                                   Sarah E. Harmon
                                                                   Kelly B. Stout
                                                                   8984 Spanish Ridge Avenue
                                                                   Las Vegas, Nevada 89148

                                                                *Attorneys for Plaintiff, Michelle McKenna*